# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

A.N.; P.B.; R.R.; B.S.; S.M.; J.C.; and H.C.,

Plaintiffs,

v.

JEFFREY LANDRY, in his official capacity as
Attorney General of the State of Louisiana;
THE LOUISIANA DEPARTMENT OF
PUBLIC SAFETY & CORRECTIONS;
THE LOUISIANA STATE POLICE;
THE LOUISIANA OFFICE OF MOTOR
VEHICLES;
THE LOUISIANA BUREAU OF CRIMINAL
IDENTIFICATION AND INFORMATION,

Defendants.

CIVIL ACTION NO. 3:20-cv-00837-JWD-RLB

INTRODUCTION ........................................................................................................................1

JURISDICTION AND VENUE ...................................................................................................3

PARTIES .......................................................................................................................................4

I.      Plaintiffs ..........................................................................................................................4

II.     Defendants ......................................................................................................................6

FACTUAL ALLEGATIONS .......................................................................................................7

I.      Louisiana's Sex Offender Registration and Notification Scheme ...............................7

        A.      Registration Requirements ................................................................................8

                i.      Who Is Required to Register ...........................................................10

                ii.     Duration of Registration ..................................................................11

                iii.    Penalties for Failure to Register ......................................................12

        B.      SORNA's Requirements and Restrictions Have Lifelong Detrimental Effects on
                the Lives of People Who Committed Sex Offenses as Children .................13

                i.      Social Media Use ...............................................................................13

        ii.     Identification Cards and Driver's Licenses ........................................16

        iii.    Presence and Residency Restrictions ...............................17

        iv.     Employment Restrictions ...............................................21

        v.      Supervised Release .........................................................23

        vi.     Other Effects .................................................................25

II.     Children Are Developmentally and Constitutionally Different from Adults............28

III.    SORNA Undermines the Sole Purpose of the Juvenile Justice System...................31

        A.      Louisiana's Juvenile System Is Meant to Be Rehabilitative, Not Punitive .................31

        B.      Subjecting Children to SORNA Requirements Is Punitive, Not Rehabilitative .........32

CLAIMS FOR RELIEF ...........................................................36

COUNT I: Cruel and Unusual Punishment ........................................36

COUNT II: Ex Post Facto Laws .....................................................37

COUNT III: Due Process—Irrebuttable Presumption .............................38

COUNT IV: Due Process—Right to Reputation.....................................40

COUNT V: Right to Trial by Jury....................................................42

COUNT VI: Compelling Speech ......................................................43

COUNT VII: Chilling Free Speech ...................................................45

COUNT VIII: Right to Intimate Association ........................................45

PRAYER FOR RELIEF ..................................................................46

## AMENDED COMPLAINT

## INTRODUCTION

1.      Louisiana turns childhood mistakes into lifelong struggles. Children who are adjudicated delinquent in juvenile court of certain offenses are subject to the harshest of Louisiana's Sex Offender Registration Laws ("SORNA"), even after they have completed their court-ordered sentences. SORNA makes it almost impossible for its registrants to obtain affordable housing, secure suitable employment, raise families, and participate as active residents of their own communities. SORNA's severe restrictions and requirements hobble individuals financially, socially, and geographically for their entire lives—on the basis of offenses they committed *as children*.

2.      Plaintiffs are seven individuals who were accused of committing offenses as children (all were between 13 and 16 years old). None was transferred to adult court; all were adjudicated delinquent in juvenile court. All Plaintiffs have finished their custodial juvenile sentences as well as all periods of juvenile probation and parole. Nevertheless, all Plaintiffs remain subject to SORNA for the rest of their lives—including lifetime registration, annual registration fees, social media bans, the orange label of "**SEX OFFENDER**" on mandatory identification cards and driver's licenses, ineligibility for certain types of jobs, extreme residency restrictions, and hefty fines and even prison time for violations of these requirements.

3.      There are virtually no second chances. Louisiana's SORNA imposes these mandatory, lifelong restrictions even though Plaintiffs were children at the time of their offenses, were adjudicated as juveniles, and without any consideration of their life experiences after a prescribed period of incarceration. No judge or jury considered evidence of steady employment, stable social and familial relationships and support systems, or the absence of any further offenses. Plaintiffs were denied the right to have their ages—that is, the fact that they were children when they committed their offenses—and the attendant characteristics of their immature age, considered pre-

1

punishment. Thus, the law presumed Plaintiffs irredeemable because of acts they committed as children without any judicial determination to that effect.

4.      Imposing such stigmatizing lifelong punishment is particularly egregious because it is based upon Plaintiffs' conduct as children, at a time when they lacked the developmental maturity necessary for sound decision-making and are therefore less culpable for their actions. As the Supreme Court has repeatedly explained, because children's brains have not yet fully developed, their susceptibility to immature and irresponsible behavior means that their "irresponsible conduct is not as morally reprehensible as that of an adult." *Roper v. Simmons*, 543 U.S. 551, 561 (2005).[1] "[Children's] own vulnerability and comparative lack of control over their immediate surroundings [give them] a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment." *Roper*, 543 U.S. at 570.

5.      As the Supreme Court has explained, even in the context of children sentenced to long periods of incarceration in adult prisons: "The reality that juveniles still struggle to define their identity means that it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Id.* In addition, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Id.* at 571. Said another way, ". . . children are constitutionally different from adults. . ." and "a sentencing rule permissible for adults may not be so for children." *Miller v. Alabama*, 567 U.S. 460, 471, 481 (2012).

---

[1] *See also Miller v. Alabama*, 567 U.S. 460 (2012) (holding that mandatorily sentencing juveniles to life without the possibility of parole is unconstitutional); *J.D.B. v. North Carolina*, 564 U.S. 261 (2011) (holding that juveniles deserve special procedural protections); *Graham v. Florida*, 560 U.S. 48 (2010) (holding that sentencing juveniles to life without the possibility of parole for non-homicidal offenses is unconstitutional).

6.    Research shows that the recidivism rates of children who commit sex offenses are among the lowest rates of recidivism among *all* people for *all* crimes.[2] Imposing lifetime registration requirements on children is therefore purely retributive and does not serve to rehabilitate or to protect public safety. Punitive registration requirements—which have detrimental effects on a person's livelihood, social position, and community integration—directly undermine the non-criminal, rehabilitative mission of the juvenile justice system.

7.    Subjecting Plaintiffs to these debilitating lifelong restrictions for offenses they committed as children violates Plaintiffs' rights under the United States Constitution, including the right to be free from cruel and unusual punishment under the Eight Amendment, the right not to suffer additional punishment than what was prescribed at the time of the offense under the Ex Post Facto Clause, the rights to fundamental fairness and due process under the Fourteenth Amendment, the right to trial by jury under the Sixth and Fourteenth Amendments, the rights against compelled speech and the chilling of speech under the First Amendment, and the right to intimate association under the First and Fourteenth Amendments. Plaintiffs seek injunctive and declaratory relief against the application of SORNA to them, people who were adjudicated as juveniles for offenses they committed as children.

## JURISDICTION AND VENUE

8.    Plaintiffs bring this action pursuant to 42 U.S.C. § 1983. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs seek redress for the deprivation of their rights under the United States Constitution.

9.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201-2202, by Fed. R. Civ. P. 57 and 65, and by the legal and equitable powers of this Court.

---

[2] *See, e.g.*, Amy E. Halbrook, *Juvenile Pariahs*, 65 Hastings L.J. 1, 13; *see also* Sharon E. Denniston & Michael F. Caldwell, *Answering the Call to Study the Effects of Juvenile SORN: Lessons from Two Studies*, Paper Presented at the ATSA 34th Annual Research and Treatment Conference (Oct. 15, 2015).

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because the Middle District is a judicial district in which at least one defendant resides and all defendants are residents of Louisiana.

## PARTIES

**I.     Plaintiffs**

11.     A.N. was approximately 13 or 14 years old at the time of his offense. He was adjudicated delinquent of a registerable offense in juvenile court in Louisiana in 2012 when he was 19 years old. He registered as a sex offender, as is mandatory under SORNA, in March of 2013. He is now 28 years old and is currently required to remain registered for life. SORNA has prevented A.N. from completing the college education he began prior to his adjudication, made it difficult for him to secure stable housing, limited his employment opportunities, caused him constant anxiety, and jeopardized his hopes for raising a family with his fiancée.

12.     P.B. was 14 years old at the time of his offense. He was adjudicated delinquent of a registerable offense in juvenile court in Louisiana in 2008 when he was 15 years old. He was confined until the age of 18. P.B. was released in 2010 and registered as a sex offender, as is mandatory under SORNA, within one week of his release. He is now 28 years old, has been registered for ten years, and he is currently required to be registered for life. SORNA has made it difficult for P.B. to find stable employment and housing, made him a target for violent physical attacks, and directly led to the breakdown of his otherwise loving marriage.

13.     R.R. was 15 years old at the time of his offense. He was adjudicated delinquent of a registerable offense in juvenile court in Louisiana in 2009. He first registered as a sex offender in March of 2011 soon after he was released from custody, as is mandatory under SORNA. He is now 27 years old and currently required to be registered as a sex offender for life. R.R. has two felony charges for failure to register, for which he served time in jail. SORNA has already significantly

4

impeded R.R.'s ability to be a parent to his three-year-old son, and R.R. worries constantly about what will happen when his son starts school. SORNA has also made it difficult for R.R. to find work and maintain stable housing.

14.     B.S. was 13 years old at the time of his offense, was arrested at the age of 14 in May 2009, and was adjudicated delinquent of a registerable offense in juvenile court in Louisiana in March of 2010. He was released from custody in 2016 and registered as a sex offender, as is mandatory under SORNA, immediately thereafter. He had previously registered when the court granted him home furloughs from secure care beginning in 2014. B.S. is now 25 years old and is currently required to register for life. B.S.'s sex offender status has affected his ability to obtain mental health care for his disability and has made it extremely difficult for him to find employment. He lives solely on disability benefits of $783 per month. He has also been excluded from affordable housing. B.S. has one felony for failure to comply with registration. He feels stigmatized and threatened due to his sex offender registration.

15.     S.M. was 16 years old at the time of his offense, and he was adjudicated delinquent of a registerable offense in juvenile court in Louisiana in 2007. He spent about four years in custody and was released on his twenty-first birthday in 2011. He registered as a sex offender after his release, as is mandatory under SORNA, and he is currently required to register for life. S.M. is now 30 years old. S.M. struggles greatly with the restrictions and stigma that SORNA imposes on him. He has attempted suicide three times as a result. SORNA has made it extremely difficult for S.M. to find steady employment and to find stable housing. He currently lives in a halfway house. S.M.'s wife experiences harassment for being married to a registered sex offender. S.M. also experiences harassment and threats to his safety.

16.     J.C. was 15 years old at the time of his offense, and he was adjudicated delinquent of a registerable offense in juvenile court in Louisiana in 2005. He was released from custody in 2009 at

5

the age of 19 and registered as a sex offender, as is mandatory under SORNA, soon after. J.C. is now 31 years old and currently required to register for life. SORNA's restrictions make it very difficult for J.C. to find work; he is currently unemployed. SORNA's restrictions also impede J.C.'s ability to be an active, involved parent in the lives of his two young children, an 8-year-old and a 2-month-old. J.C.'s wife is a target of harassment because of his sex offender status.

17.     H.C. was 14 years old at the time of his offense, he was arrested at age 15, and he was 16 years old when he was adjudicated delinquent of a registrable offense in juvenile court in Louisiana in 2016. H.C. spent four years confined at Bridge City Center for Youth and was released on September 5, 2020. He registered as a sex offender, as is mandatory under SORNA, on September 14, 2020. He is now 21 years old and is currently required to register for life. H.C.'s registration status has already impacted his employment, his ability to contribute to his family, his ability to engage with his community, and his ambitions for attending college and joining the military.

**II.     Defendants**

18.     Jeffrey Landry is the Attorney General of the State of Louisiana. He is sued in his official capacity. It is the attorney general's state constitutional duty to enforce all laws of the state pursuant to La. Const. art. IV, § 8. Attorney General Landry is also the Chief Legal Officer of the state's Department of Justice ("DOJ"). The DOJ is charged with determining the end date of a person's registration requirement based on the person's criminal history and registration history. La. R.S. §§ 15:544; 544.2. The Attorney General is domiciled in the Middle District of Louisiana.

19.     The Louisiana Department of Public Safety & Corrections ("DOC") oversees the custody and care of adults in prison and includes adults under probation and parole supervision, pursuant to La. R.S. § 36:4. The DOC is responsible for issuing the sex offender identification cards described in La. Rev. Stat. Ann. § 40:1321, as well as the driver's licenses bearing the "**SEX**

6

OFFENDER" designation described in La. Rev. Stat. Ann. § 32:412. The domicile of the DOC and its divisions is the Middle District of Louisiana, pursuant to R.S. 15:821.1.

20.     The Louisiana State Police ("LSP") houses the Bureau of Criminal Identification and Information, which develops and maintains the central registry known as the State Sex Offender and Child Predator Registry. La. R.S. § 15:542.1.5. The Louisiana legislature granted the bureau exclusive authority to promulgate rules and regulations to implement SORNA. *Id.* The LSP is domiciled in the Middle District of Louisiana.

21.     The Louisiana Office of Motor Vehicles ("OMV") is responsible for issuing and annually renewing the driver's licenses of people who are required to register as sex offenders with the words "SEX OFFENDER" printed on the licenses in orange letters. La. R.S. § 32:412(I)(1) and (4). The OMV is domiciled in the Middle District of Louisiana.

22.     The Louisiana Bureau of Criminal Identification and Information is charged with "maintain[ing] a central registry of sex offenders and adopt[ing] regulations and procedures to prescribe the terms and conditions under which information shall be released in accordance with the provisions of R.S. 15:540 through 549." La. R.S. § 15:578(A)(7). The Bureau is domiciled in the Middle District of Louisiana.

## FACTUAL ALLEGATIONS

## I.     Louisiana's Sex Offender Registration and Notification Scheme

23.     Louisiana's sex offender registry is part of the State's intent "to provide some of the strictest criminal penalties for the commission of sex offenses, and one of the most extensive sex offender registration and notification provisions in the United States."[3]

---

[3] La. R.S. § 15:561(A). Louisiana's sex offender registration scheme involves many interrelated provisions found throughout the Louisiana Revised Statutes, but it is primarily outlined in Louisiana Revised Statutes §§ 14:91.2, 14:91.5, 15:540-553, and 15:560-561.

24.    Plaintiffs A.N., P.B., R.R., B.S., S.M., J.C., and H.C. were all adjudicated delinquent in juvenile court for sex offenses that occurred when Plaintiffs were children 16 years old or younger.[4] All were required to register as sex offenders under SORNA on or before completion of their sentences, and all remain subject to SORNA's restrictions. All are adults who have served their juvenile sentences and are otherwise no longer juvenile system-involved, but continue to be punished because of SORNA.

A.    **Registration Requirements**

25.    Under SORNA, a person required to register must register in person with the sheriff of the parish(es) and the chief of police or police department of the municipality(ies) in which they reside, work, *and* attend school, all within three business days of establishing residence in Louisiana. La. R.S. § 15:542(B)(1)-(2). A person required to register who attends a postsecondary institution must also register with the campus law enforcement agency at least one business day before beginning a school term. La.R.S. § 15:542(B)(3).

26.    Registration requires that a registrant provide all of the following information: (a) their name and aliases; (b) their address; (c) the name and address of their jobs or travel routes for work, if any; (d) the name and address of their school, if any; (e) two forms of proof of residence; (f) the crime they were convicted of and the date, place, docket number, statute, and sentence of their case; (g) a current photograph of them; (h) their fingerprints, palm prints, and a DNA sample; (i) their telephone numbers; (j) a description of their cars and a copy of their driver's license and ID card; (k) their social security number and date of birth; (l) their physical description including sex, age, weight, scars, race, etc.; (m) all of their e-mail addresses, online screen names, IP addresses, and

---

[4] Under Louisiana law, for offenses committed before March 1, 2019, a "child" is "any person under the age of twenty-one, including an emancipated minor, who commits a delinquent act before attaining seventeen years of age." La. Ch. C. Art. 804 (for offenses committed after March 1, 2019, a person who commits a delinquent act before the age of *eighteen* is a child). All Plaintiffs in this case

the like, and they must provide notice before using each to communicate on the internet; (n) temporary lodging information regarding anywhere they plan to stay for more than 6 days, 3 days before such travel, or 21 days before any international travel; and (o) their travel and immigration documents establishing their immigration status. La. R.S. § 15:542(C).

27.     SORNA requires the Louisiana Bureau of Criminal Identification and Information to maintain a searchable public registry which includes the photograph, address, race, height, weight, age, sex, physical description, and description of the offense of every person required to register.[5] Juvenile registrants are required to have their information placed onto the public registry.[6]

28.     People who are adjudicated delinquent for sex offenses they committed as children are generally exempt from the community notification requirements that apply to adult registrants,[7] but this exemption does little to protect the safety and reputation of juvenile registrants since they are not exempt from the searchable public registry.

29.     The person required to register must also pay an annual registration fee of $60. La. R.S. § 15:542(D). Registrants are either required to renew their registration quarterly, twice annually, or annually, according to their crime of conviction. La. R.S. § 15:542.1.1.

---

were adjudicated delinquent while they were under the age of twenty-one for acts that occurred while they were under the age of seventeen.

[5]     *See generally* Offender Search, LA. STATE POLICE, http://www.icrimewatch.net/results.php?SubmitAllSearch=1&AgencyID=54450 (last visited Dec. 7, 2020).

[6] "Upon receipt of the registration and information of any person subject to the provisions of this Chapter, **including juveniles required to register**, the bureau shall immediately enter the appropriate information in the public registry." La. R.S. § 15:542.1.5 (emphasis added). This "including juveniles required to register" term was added in 2008. Acts 2008, No. 816, § 1, effective Aug. 15, 2008.

[7] "Any adult residing in [Louisiana] who has pled guilty to, has been convicted of, or where adjudication has been deferred or withheld for the perpetration or attempted perpetration of, or conspiracy to commit, a sex offense as defined in R.S. 15:541 or a criminal offense against a minor as defined in R.S. 15:541 shall be required to provide" community notification. La. R.S. § 15:542.1(A).

9

30.     Plaintiff A.N. has struggled at times to pay the $60 annual registration fee. The first year, his mother had to pay it for him. Since then, A.N. has had to forego buying a bus pass several times in order to afford paying the fee. Without friends and family able to drive him to work during those times, A.N. would have lost his job. Plaintiff B.S. also struggles to pay the $60 fee and sometimes has to ask family members for help. Plaintiff J.C. has been threatened with jail when he has had difficulty paying the $60 fee in the past.

31.     These requirements are "mandatory and shall not be waived or suspended by any Court. Any other order waiving or suspending sex offender registration and notification requirements shall be null, void, and of no effect." La. R.S. § 15:542(F)(1).[8] SORNA does not provide a hardship waiver provision when a registrant is unable to pay their annual fee. Failure to pay can result in arrest and jail while awaiting a new charge for failure to register.

### i.     Who Is Required to Register

32.     SORNA delineates the offenses that trigger registration requirements. *See* La. R.S. § 15:542(A). They require children over the age of 14 at the time of the offense to register as a sex offender or child predator **for their entire lives** if they are adjudicated delinquent for perpetration, attempted perpetration, or conspiracy to commit one of twenty-seven crimes.[9]

33.     All Plaintiffs are required to check in every three months with the sheriff's office and provide updated personal information, including their addresses and what vehicles they drive.

---

[8] A person otherwise required to register can only have their requirements waived if they are convicted of one of three offenses under extremely limited circumstances. La. R.S. § 15:542(F)(2)-(4). Each of these waiver procedures requires either the district attorney and petitioner to jointly move to waive the requirements in the court of conviction or requires the petitioner to file a motion in the court of conviction, which the district attorney, state police, and state Department of Justice must be served with and can contest. *Id.*

[9] Including (a) aggravated or first degree rape, (b) forcible or second degree rape, (c) second degree sexual battery, (d) aggravated kidnapping of a child under 13, (e) second degree kidnapping of a child under 13, (f-g) aggravated crime against nature, or (h) any equivalent offense under the laws of another jurisdiction. La. R.S. § 15:542(A)(3).

### ii.    Duration of Registration

34.    People who are subject to SORNA for offenses they committed as children are always required to register for their entire lifetimes, La.R.S. § 15:544(B)(2), although they may be eligible for review after 25 years in certain circumstances. La. R.S. § 15:544(E)(2). By contrast, *adults* convicted of sex offenses are not automatically required to register for their entire lifetimes and may be required to register for just 15 or 25 years. La. R.S. § 15:544(A-B).

35.    People convicted as adults are released from the requirements 15 years after their first registration. La. R.S. § 15:542(A). An original 15-year term can be reduced to 10 years by motion to the court if the person required to register maintains a clean record for those 10 years. La. R.S. § 544(E)(1). An adult who is convicted of a sex offense against a minor will be required to register for 25 years after their first registration in Louisiana. La. R.S. § 15:542(B)(1)

36.    A person must register *for their entire lifetime* (1) if they committed an aggravated offense, (2) if they have a prior conviction requiring registration, or (3) *if they were a juvenile at the time of the offense.* La. R.S. § 15:542(B)(2). Louisiana therefore reserves lifetime registration for individuals who commit the most serious sex offenses *and for children* who commit *any* relevant sex offense.

37.    A lifetime term can be reduced to 25 years by motion to the court for children required to register if they maintain a clean record for those 25 years. La. R.S. § 15:542(E)(2). Maintaining a clean record requires meeting all of the registration and notification requirements every year of the required term. La. R.S. § 15:542(E)(3). The district attorney, Department of Public Safety and Corrections, state police, and Department of Justice can oppose the motion for a reduced term. La. R.S. § 15:542(E)(3)(a)(iii)-(3)(b). The burden is on the person required to register to show clear and convincing evidence of their clean record. La. R.S. § 15:544(E)(4)(d). At the end of that term, the Department of Justice will determine the end date of the registration requirement based on the person's criminal history and registration history. La. R.S. §§ 15:544; 544.2

### iii.    Penalties for Failure to Register

38.    Other courts have recognized that Louisiana has among the strictest, if not the strictest, penalties for failing to register or pay the registration fee in the country. *See Bradshaw v. State*, 284 Ga. 675, 682 (2008).

39.    If a person required to register fails to pay the annual registration fee just once, they will be fined up to $500, imprisoned for up to 6 months, or both. La. R.S. § 15:542.1.4(A)(3).

40.    If a person required to register fails to pay the annual registration fee twice or fails to meet the other registration requirements (timely provision of any information like community notification, address updates, renewal of registration, etc.) only once, they will be fined up to $1,000 and be imprisoned for 2-10 years. La.R.S. §15:542.1.4(A)(1)

41.    If a person required to register fails to pay the annual registration fee a third time or fails to meet any of the other registration requirements twice or more, they will be fined $3,000 and be imprisoned for 5-20 years. La.R.S. § 15:542.1.4(A)(2).

42.    If a person required to register is convicted of any felony including failure to register, their registration term (laid out above) will restart completely on the date of their release, with no credit for the duration of their prior registration compliance. La.R.S. § 15:544(D)(1)-(2).

43.    Plaintiff R.R. has two felony charges for failure to register. The first occurred in 2013 when R.R. failed to get a housing affidavit notarized because he could not pay for the notary's services, and he was caught having a social media account that he did not know was prohibited under SORNA. As a result, R.R. spent six months in jail. The second charge occurred in 2015 when R.R. could not report a home address. He had been living with his cousin and aunt, but after his cousin committed suicide, his distraught aunt kicked him out of the house, and R.R. fled to a different parish. Due to not having a home address, R.R. spent one year in jail.

44.     Plaintiff B.S. pled guilty to one felony count of "attempted failure to register as a sex offender," which occurred when he missed his 90-day check-in while attempting to participate in JobCorps. B.S. was fined $750, which his grandfather had to pay because B.S. was not able to, and he was sentenced to two years at hard labor, which was suspended, and he was placed on probation.

45.     Plaintiff S.M. has a felony from 2019 for failure to register. He spent a few weeks in jail and was fined $2,500.

**B.      SORNA's Requirements and Restrictions Have Lifelong Detrimental Effects on the Lives of People Who Committed Sex Offenses as Children**

46.     SORNA imposes a multitude of requirements and restrictions that severely impede Plaintiffs' ability to lead safe, healthy lives. Its requirements drastically limit housing options, exclude registrants from many employment opportunities, prevent registrants from actively participating in their children's school and social lives, and create a strong stigma that profoundly affects registrants' social and psychological wellbeing.

**i.      Social Media Use**

47.     Louisiana law prohibits certain SORNA registrants from using "social networking websites." La.R.S. § 14:91.5 (A-B). The social media prohibition applies to SORNA registrants adjudicated or convicted for either specific sex offenses or for any sex offense where the victim was a minor.

48.     The specific offenses include indecent behavior with juveniles (including sexting), pornography involving juveniles, computer-aided solicitation of a minor, and video voyeurism. La. R.S. § 14:81.

49.     If the victim was a minor, then the social media prohibition applies regardless of the specific sex offense, even if the offense is unrelated to internet usage in any way. *Id.* Thus, all juvenile SORNA registrants adjudicated for any sex offense involving a minor, regardless of the fact that they were minors themselves, are banned from using social networking websites for life.

50.     The prohibition against using social networking websites prevents juvenile SORNA registrants from engaging in political speech on Facebook, Twitter, and Instagram and from receiving news or engaging in any public discourse on these and similar websites. They cannot message or view pictures or posts by family members who live in other states or countries. Additionally, the prohibition may prevent the registrant from creating online banking accounts, paying bills online, registering to vote online, creating online profiles to buy or sell things on websites such as Facebook Marketplace or eBay, or advertising any businesses.

51.     If a registrant is allowed to access social media, he must include in his profile an indication that he is a sex offender, along with his crime and address. La.R.S. § 15:542.1(D)(1).

52.     Violation of the social media prohibition can lead the SORNA registrant to be charged with unlawful use of a social networking website. The first conviction of unlawful use of a social networking website carries a fine of up to $10,000 and up to 10 years of prison without parole, probation, or suspension of sentence. La. R.S. § 14:91.5(C)(1). A subsequent conviction of unlawful use of a social networking website carries a fine of up to $20,000 and 5-20 years of prison without parole, probation, or suspension of sentence. La. R.S. 14:91.5(C)(2).

53.     Plaintiff A.N. was required to deactivate his Facebook and Instagram profiles after registering. The prohibition against keeping online social media accounts has left A.N. without a way to stay in touch with many people he has met throughout his life, such as during childhood, high school, college, and after leaving confinement. A.N. estimates that he would have stayed in contact with at least 200 people online if he were allowed. A.N. also has family members whom he cannot contact online, including one cousin in Germany and another in Illinois. One of A.N.'s primary hobbies is playing the Dungeons and Dragons board game, but he is unable to play online or in online groups because doing so would require him to violate SORNA by creating an online account. A.N. is also required to register all email addresses and his internet service provider.

14

54.     Under SORNA restrictions, Plaintiff P.B. does not own a private e-mail address. Instead, P.B.'s registration officer keeps his login and password information and can inspect his email inbox and outbox at any time.

55.     Plaintiff R.R. buys, restores, and re-sells cars, but under SORNA, he cannot create any social media account that would advertise or grow his small business. R.R. cannot access Facebook Marketplace, where he could buy and sell cars locally. R.R. also cannot create or maintain a Facebook business page, so his business seems less legitimate to online searchers because it has no internet presence. The inability to access Facebook under SORNA severely affects R.R.'s ability to keep his small business operable and profitable.

56.     Plaintiff B.S. is not allowed to have any social media accounts per SORNA requirements. Consequently, B.S. cannot interact with anyone over Facebook, such as his family members in Illinois, Tennessee, and Baton Rouge. B.S. cannot access his cousin's regular Facebook post updates about his cousin's baby who recently had to be put on a ventilator. B.S. has made several friends over the past few years whose phone numbers he does not know, and he cannot find or contact them because he cannot look them up on Facebook or other social media platforms.

57.     Plaintiff J.C. is not allowed to have any social media accounts per SORNA requirements. As a result, he cannot online message with his family members who live in Alabama or see their life updates posted on Facebook.

58.     When Plaintiff H.C. registered under SORNA, his officer told him that he had to delete all of his social media accounts immediately or he would be arrested for failure to comply with SORNA. The officer required H.C. to send screenshots to prove that he had deleted all accounts. Not having access to Facebook, Instagram, Twitter, and other social media platforms prevents H.C. from being able to communicate with his friends. For example, since leaving Bridge City Center for

Youth, H.C. has not been able to remain in contact with any of the people he met there because they traded social media contact information, not phone numbers, upon leaving.

### ii.    Identification Cards and Driver's Licenses

59.    All people required to register, including children adjudicated as juveniles who are not otherwise subject to the community notification requirements, must obtain and carry at all times special sex offender registration cards which include the words "**SEX OFFENDER**" in orange capital letters, and which must be renewed every year. La. R.S. 40:1321(J). An image of a sample identification card appears below with the words "**SEX OFFENDER**" under the photo:



60.    If any person required to register is issued a driver's license, the license must include the words "**SEX OFFENDER**" in orange, and the person must appear in person at the motor vehicle field office to renew their driver's license every year, in addition to the other registration requirements from section 15:542. La. R.S. § 32:412(I).

61.    As part of the registration process, all Plaintiffs are required to obtain driver's licenses and identification cards labeled "**SEX OFFENDER**" and present the vehicle registration for any vehicles they may be driving. They must also pay a fee of between $25 and $40 each year for the license renewal. La. R.S. § 32:412(I).

16

62.     The "**SEX OFFENDER**" label creates a stigma that limits Plaintiffs' employment and other opportunities and Plaintiffs do not agree that the label accurately describes them. Plaintiff B.S. was recently denied a job at Burger King when the interviewer asked for a copy of his license and saw the "**SEX OFFENDER**" designation on his state-issued identification card. Potential employers have declined to call Plaintiff B.S. back after seeing his identification card with the "**SEX OFFENDER**" label. Plaintiff A.N. does not go to specific establishments because he would have to show his identification card or driver's license. Plaintiff S.M. has been verbally abused and threatened because of the labels on his identification card and driver's license.

63.     The Supreme Court of Louisiana recently overturned the requirement that registrants' state-issued identification cards bear the "**SEX OFFENDER**" designation in review of a motion filed by a defendant in a criminal case, *see State v. Hill*, 2020 La. LEXIS 2512 (La. Oct. 20, 2020), but Plaintiffs are still required to have the designation on their licenses. Plaintiff A.N. contacted the Office of Motor Vehicles to ask whether he could get the designation removed from his identification card and driver's license, and he was told that no change has yet been made to the policy. Plaintiff H.C. also attempted to obtain a new license and identification card without the **SEX OFFENDER**" labels by inquiring with the state registry officials. Plaintiff R.R. also attempted to obtain a new license and identification card without the labels by inquiring with the office where he goes for his regular check-ins. Despite these efforts, Plaintiffs A.N., H.C., and R.R. have not been granted new licenses or identification cards.

### iii.    Presence and Residency Restrictions

64.     Louisiana has an extensive set of residency restrictions for all people required to register, but the restrictions are especially onerous when the victim is under 13, which is

disproportionately likely to be the case for people who committed offenses as children.[10] When the victim is under 13, a person found to have committed a sex offense per La. R.S. § 15:541 may not ever be physically present, for any amount of time, within 1,000 feet of any public or private elementary or secondary school, or any school vehicle, when persons under the age of eighteen years are present on the school property or in a school vehicle. La. R.S. § 14:91.2(A).

65. Registrants also may not establish a residence within 1,000 feet of early learning centers or child care centers, playgrounds, public or private youth centers, or public swimming pools, among other places. La. R.S. § 14:91.2(B). Violators of the unlawful presence of a sex offender section are fined up to $1,000, imprisoned for up to one year, or both. La. R.S. § 14:91.2(F).

66. People convicted of sex offenses under R.S. 15:541, which includes all juvenile sex offenders, may not establish a residence within three miles of the victim of their offense, knowingly be within 300 feet of the victim, or communicate with the victim or his or her immediate family without written consent, even if the victim is an immediate or extended family member. La. R.S. § 14:91.9(A). There is no exception for holidays, graduations, or other occasions. Establishing a residence or being physically too close to the victim carries a fine of up to $1,000, one year in prison, or both. La. R.S. § 14:91.9(C)(1). Communicating with a victim or their family without consent carries a fine of up to $500, 6 months in prison, or both. La. R.S. § 14:91.9(C)(2).

67. Plaintiffs all had to provide affidavits verifying their residence as part of the registration process, and SORNA's residency restrictions make it difficult for Plaintiffs to find suitable and affordable housing.

68. SORNA's restrictions have made it difficult for Plaintiffs A.N., P.B., R.R., B.S., and S.M. to find stable housing.

---

[10] Finkelhor, Ormrod, and Chaffin, "Juveniles Who Commit Sex Offenses Against Minors," *available*

69.     A.N. has had difficulty securing stable housing. In his first year as a registered sex offender, A.N. lived in five different homes. He had to move immediately after registering because his previous home was too close to a school. He then slept on his father's couch temporarily, stayed with his uncle for a few months, and lived temporarily with his mother's boyfriend. After A.N. got his own place, the landlady unexpectedly doubled his rent, which forced him to move out. He believes that she did this because she found out he was on the registry.

70.     When P.B. was on parole, his parole officer told him that he could not live with his mother because his minor niece was also living there. P.B. is unsure if he can live with his wife because she has minor children.

71.     R.R. has struggled to get residences approved by his parole officer. He has been kicked out of multiple residences by landlords who did not want a registered sex offender renting from them.

72.     B.S. has had extreme difficulty finding stable housing, and he has experienced homelessness. He recently applied to live in a public housing development, but he was denied because of his status as a sex offender. Last year, he applied for housing with a different public housing entity, but was also denied for the same reason.

73.     S.M. has been unable to stay with friends or family because he cannot live with children. He is not allowed to live in public housing as a registered sex offender; he has tried to apply and was rejected. He has been arrested several times for not having an address. He now lives in a halfway house. He placed himself in a mental health treatment program because he knew that they would provide housing.

74.     The presence restrictions also severely limit Plaintiffs' employment options, as they are not permitted to work within 1,000 feet of school property, public parks, or early learning

_at_ https://www.ncjrs.gov/pdffiles1/ojjdp/227763.pdf.

centers. Plaintiff A.N. worked at a pizza place for about one month until the police department told him it was too close to a school. Before he registered under SORNA, Plaintiff H.C. was working at his brother's mechanic shop making $15 per hour. After registering, H.C. was told that he could not work there during school hours because the shop is approximately 975 feet from a school.

75.     Plaintiffs' educational opportunities are also affected by the presence restrictions. Before he was arrested, Plaintiff A.N. spent one year studying electrical engineering at the University of New Orleans ("UNO"). His career goal was to be an engineer working to integrate clean energy sources into city infrastructure systems. An entry level salary for such work is around $75,000. However, once A.N. was released from custody, UNO refused to re-enroll him because the campus is located near a school—A.N.'s own high school. Eight years later, A.N. is still trying to pay for this single year he spent in college as all his loans went into default while he was in custody despite his efforts to defer. A.N. is unable to enroll at UNO, Delgado Community College, Loyola University, or Tulane University because they are all too close to schools or parks for him to be able to attend.

76.     Presence restrictions also severely impact Plaintiffs' abilities to be actively involved in their children's (or other young family members') school and social lives.

77.     Plaintiff A.N. worries about having children with his fiancée because he would not be able to pick them up at school, take them to daycare, attend their sports games or activities, take them to parks, or engage in many of the other responsibilities and pleasures of parenthood.

78.     Plaintiff R.R. was never able to visit his son's daycare to see where his child was spending his time and who was caring for him there. R.R. worries constantly about what will happen when his son starts school—whether R.R. will be able to attend school plays and sporting events and whether he will have to wear an identifier to alert everyone that he is a "sex offender."

79.     Plaintiff J.C. is not allowed to go to his children's schools. He cannot drop off his eight-year-old daughter at school or pick her up. He cannot chaperone his daughter's field trips. He

was not able to attend his daughter's graduation ceremony at school. He cannot take his children to parks. He cannot put up Halloween decorations. He cannot attend the annual Christmas event in the local park where the children take pictures and pass out gifts. These restrictions place a huge burden on his wife, who must do all of these things without J.C.'s help. And because his wife works, finding someone to pick up their children from school is often a serious concern.

80.     Plaintiff H.C. cannot pick up his younger sister or brother from school or his nephew from daycare because he is not permitted to be physically present at schools. He also cannot attend any school functions—he cannot watch his niece dance at school or cheer on his siblings at school events. He is unable to participate in activities with his family, such as camping in state parks. H.C. would like to have a family of his own one day, but is scared that he would not be able to properly care for his children—he would not be able to take them to parks or pick them up from school—due to his lifelong registration status.

iv.     **Employment Restrictions**

81.     Separate from the limiting effect that SORNA's presence restrictions have on Plaintiffs' employment opportunities, Louisiana law expressly prohibits people who are registered as sex offenders from a large number of specific occupations, including driving cars for hire and providing any in-home services. La. R.S. § 15:553. For example, a person registered as a sex offender may not work for a driver contractor service such as a taxi service, Uber, or Lyft; do any construction or repair work on occupied homes; or work as an in-home medical caregiver.

82.     The restriction on in-home work has made it difficult for Plaintiff R.R. to find work, and he has never been able to obtain a job that pays more than $10 per hour. R.R. has experience as a painter, which he used to do growing up with his stepfather, but as a registered sex offender, he is not permitted to work inside people's homes, so he cannot work as a painter. If he could work as a painter, R.R. could earn more money.

21

83.     Even independent of these specific employment restrictions (and the limiting effect of the presence restrictions), SORNA's public registry requirement creates a significant barrier to many job opportunities. Ordinarily, without the public registry, juvenile offenses would likely not be visible in a standard employment background check. But the public registry ensures that Plaintiffs' juvenile offenses are just a Google search away.

84.     Plaintiff A.N. has applied for jobs at Winn-Dixie, McDonald's, and Rouse's, but was denied each time because he failed the background checks. He is unable to take any job that requires a background check, which severely limits his options. As a result, many minimum-wage jobs are unavailable to him besides jobs in small-scale, non-corporate restaurants that do not require background checks.

85.     SORNA's restrictions made it difficult for Plaintiff P.B. to find steady employment. For a while, he was unable to find a job he could keep for more than two or three months, because every employer would fire him once his background check came through. He had a job at a car dealership as a mechanic making $22 per hour, but he got fired after four or five weeks solely because of his sex offender status. His current employer does not care about his criminal background, but P.B. now only makes $13 per hour—far less than what he was earning previously.

86.     Plaintiff B.S.'s sex offender status has made it extremely difficult for him to find employment. He was able to find a job for about a year but lost it due to the pandemic, and he has been unable to find work since, instead surviving solely on disability benefits of $783 per month. B.S.'s sex offender status prevented him from participating in JobCorps, a residential career training program run by the U.S. Department of Labor. B.S. moved to Oklahoma City to participate in JobCorps in 2016, but he was kicked off the campus because he was a registered sex offender.

87.    SORNA has made it extremely difficult for Plaintiff S.M. to find steady employment. He is willing to do any type of work and generally does odd jobs to get by, and he is currently receiving social security.

88.    Plaintiff J.C. also struggles to find work due to SORNA's restrictions. He is currently unemployed, and his wife bears the sole responsibility of earning money for their family. He would like to be a mechanic, but he has struggled to find work in this area.

89.    Plaintiff H.C. has applied to jobs at Dollar General and O'Reilly Auto Parts, at which he would make only $9 an hour. Both employers require background checks, which H.C. feels confident he will fail due to his status as a sex offender. H.C. wants to serve his country by joining the armed forces. However, when H.C. reached out to a recruiter, he was told that he would never be accepted into the Army, Navy, or Air Force because he is a registered sex offender. H.C. also wants to go to college, but he is worried that he will not be accepted due to his registration status.

v.    **Supervised Release**

90.    People convicted of sex offenses as defined in R.S. 15:541 when the victim is under 13 must meet at least once a month in-person with their "supervised release" officer to update their registration information, La. R.S. § 15:561.5(2); are subject to periodic visits from their supervising officer without prior notice, *id.*, at § (3); must abide by *any* curfew set by their supervising officer, *id.*, at § (4); must report to the supervised release officer whenever directed to do so, *id.*, at § (7); "[i]n all respects, conduct [themselves] honorably, work diligently at a lawful occupation, and support [their] dependents, if any, to the best of [their] ability", *id.*, at § (9); "[s]ubmit [themselves] to available medical, psychiatric, or mental health examination and treatment for persons convicted of sex offenses when deemed appropriate and ordered to do so by the supervised release officer, *id.*, at § (13);" defray the cost of their supervised release by paying the Department of Public Safety and Corrections in a sum and manner determined by that department, *id.*, at § (14); and submit to in

23

person or remote monitoring of all e-mails and internet communications, web history, and periodic unannounced inspection of their digital devices. *Id.*, at § (16).

91.     Plaintiff A.N. is required to show up to registration appointments every three months. The appointments are time-consuming; he has to be there at 9 a.m. and must miss work each time. He usually tells his employers that he has a doctor or dentist appointment because he is afraid and ashamed to tell them the truth. He is worried that calling out sick so often may eventually cause him to be fired. A.N. finds it difficult to understand the exact restrictions and requirements under SORNA because they are vague and numerous. He wants to be compliant, but he is afraid to ask questions because he does not want to draw suspicion.

92.     Plaintiff P.B. is required to register every three months, on the first Wednesday of the month, and he is required to pay his registration fees every year in February.

93.     Plaintiff B.S. is required to go to the sheriff's office every 90 days and obtain a new identification card every year.

94.     Plaintiff J.C. is required to check in every three months with the sheriff's office, including telling them where he lives, whether he has any additional tattoos, and what vehicle he is driving. He also has to pay $60 every year. He has been threatened with jail when he has had difficulty paying the $60 fee in the past.

95.     First time failure to comply with provisions of supervised release promulgated by the Department of Public Safety and Corrections shall be fined up to $1,000 and imprisoned with hard labor for 2-10 years without parole, probation, or suspension of sentence. La. R.S. § 561.7. Subsequent failures to comply with provisions of supervised release shall be fined $3,000 and imprisoned 5-20 years without parole, probation, or suspension of sentence. La. R.S. § 15:561.7.

vi.     **Other Effects**

96.     In addition to its debilitating effects on employment, housing, education, and parenting, SORNA also places enormous strain on Plaintiffs' familial and personal relationships, stigmatizes Plaintiffs among their communities and friends, and sometimes even makes Plaintiffs vulnerable to physical violence.

97.     Despite extensive evidence to the contrary, "the common view of registered sexual offenders is that they are particularly dangerous and more likely to reoffend than other criminals." *In re J.B.*, 107 A.3d 1, 16 (Pa. 2014); *see also State v. Letalien*, 985 A.2d 4, 23 n.14 (Me. 2009) (recognizing that, while sex offender registries communicate "accurate information," "a wholly stigmatizing and unwelcome public status is being communicated, not mere neutral government-held information"). Because of this stigma, people required to register encounter psychological harm and obstacles to participating in daily life.

98.     Plaintiff A.N. is engaged to be married and wants to have a family with his fiancée, but SORNA puts a strain on their relationship, surrounding them with stigma and practical difficulties, and A.N. worries that his fiancée will eventually leave him because of the complications. A.N.'s registration status causes him anxiety and embarrassment. He tries to hide it from his friends, but this taints his friendships. He does not go to bars with his friends because he is embarrassed to show his identification with the "SEX OFFENDER" label on it. He is constantly being cautious and reminding himself to remain uninteresting and not to draw attention because the information about his sex offender status is just a Google search away.

99.     The burdens of SORNA put a huge strain on Plaintiff P.B.'s marriage and ultimately were a major cause of P.B.'s physical separation from his wife. P.B. and his wife still love each other and still talk every day, but the pressure of the restrictions and P.B.'s desire to protect his wife caused them to live in different cities. P.B.'s wife and her five children live in Vicksburg, Mississippi,

and he has been trying to move there for the past two years. However, the registry office in Vicksburg informed P.B. that he cannot live there because they are unsure how to register him as a juvenile sex offender, a status that does not exist in Mississippi. As a result, P.B.'s status as a juvenile sex offender is currently preventing him from being able to live in the same city as his wife and children.

100.    P.B.'s sex offender status has also endangered his physical safety. He has been attacked several times by men who found out that he was a registered sex offender, starting in 2010 when he was first released from confinement. These attacks involved groups of two or three men punching, kicking, and throwing things at him. He sustained injuries such as a black eye and scratches on his face.

101.    P.B. has experienced significant social stigma and anxiety as a result of SORNA's online publication requirements. When P.B. was 19, he was dating a girl whose parents found out that he was on the registry. The parents located his picture and description from the sex offender registry website and posted this information onto Facebook in order to publicly shame him. Additionally, many members of P.B.'s wife's family do not know about his status as a sex offender, but he is often worried that they will Google his name and find this information online because it has happened to him before. P.B.'s sex offender status has made it extremely difficult for him to maintain friendships and build community. When people find out about his registration, they do not want to be friends with him anymore.

102.    SORNA has impeded Plaintiff R.R.'s ability to be a parent to his three-year-old son. When he was on parole, he was told that he could not be present for the birth, and he was not allowed to live with his son for the first three months of the infant's life. He is terrified about how being a registered sex offender will continue to impact his role as a father. On top of his concerns regarding presence restrictions when his son starts school, R.R. worries about whether his son will

be able to have sleepovers at R.R.'s house, and even whether other parents will allow their children to be friends with R.R.'s son. Also, R.R. is not allowed to take his son trick-or-treating or to have trick-or-treaters at his house.

103.    Plaintiff B.S.'s sex offender status has affected his ability to obtain mental health care for his disability. He was once turned away by a mental health care facility and told that he could not be treated there because there would be children present.

104.    SORNA has also negatively affected B.S.'s family connections. While on supervised release, he was unable to see his younger brother, with whom he is very close, for about a year, and he had to spend Thanksgiving alone and apart from his family. B.S. is unable to attend his younger brother's basketball and football games because he cannot go to any schools. B.S. is unable to visit his grandmother at all because her residence has restrictions that exclude him as a registered sex offender. He cannot attend family events in state parks and campgrounds.

105.    SORNA has made it difficult for B.S. to build social and romantic connections. He does not spend much time with friends because he worries about how people will treat him due to his sex offender status. He also struggles with dating; he worries about how a potential partner would react to his status. B.S. often feels stigmatized and threatened due to his sex offender registration. When he tried to help a neighbor family by mowing their lawn while the father was working offshore, the father threatened to call the police upon his return due to B.S.'s registration status. B.S.'s father was unable to resume a trucking job he once held because the owner of the truck found out that B.S. was a registered sex offender and did not want someone whose son was a sex offender working for him.

106.    Plaintiff S.M. struggles greatly with the restrictions and stigma that SORNA imposes on his life. He has attempted suicide three times as a result.

27

107.     S.M.'s sex offender status takes an enormous toll on his marriage. S.M. was married in 2016, but he and his wife are living separately due to the strain of S.M.'s sex offender status. People in the community harass S.M.'s wife, asking her why she married a "rapist," criticizing her, and calling her names. S.M. does not have much of a social life because of the stigma of being a sex offender. His registration tends to create problems in his friendships, so he avoids getting close to people.

108.     S.M. has experienced harassment and threats due to his status as a sex offender, including people lying to the police about his conduct with no evidence of any wrongdoing on his part. People also call him names and threaten to hurt him.

109.     Plaintiff J.C.'s status as a sex offender causes serious difficulties for his marriage. J.C.'s wife has been a target of harassment. She has lost a lot of friends and has been judged harshly by people in their community for marrying a registered sex offender. People cut off contact with J.C. and his wife when they find out about his history. J.C. also was unable to attend his wife's graduation ceremony when she became a certified nursing assistant.

## II.     Children Are Developmentally and Constitutionally Different from Adults

110.     Children are developmentally and constitutionally different from adults, and legal standards must be calibrated to take into account the realities of adolescent development.

111.     The United States Supreme Court has issued several opinions acknowledging the weight of scientific evidence that children are different from adults due to their adolescent development and diminished capacity and have a unique capacity to mature and change. For these reasons, the Court has held that even when children are prosecuted as adults (unlike Plaintiffs in the instant case), their age necessitates certain leniencies and safeguards that are not afforded to adults.

112.     For example, in *Roper v. Simmons*, the Court held that imposing the death penalty on adolescents violates the Eighth Amendment because, as a class, youth are less culpable, more

impulsive, and more susceptible to change than adults are. 543 U.S. 551 (2005). In *Graham v. Florida*, the Court extended the logic of *Roper* to hold that imposing certain life without parole sentences on adolescents violates the Eighth Amendment because of these same characteristics, and the Court noted that the distinctions are based not only in developmental research, but also in recent studies of the adolescent brain. 560 U.S. 48 (2010). In *Miller v. Alabama*, the Court observed that youth "is a moment and condition of life when a person may be most susceptible to influence and to psychological damage." 567 U.S. 560 (2012). "Time and again, [the] Court has drawn [the] commonsense conclusions . . . that children generally are less mature and responsible than adults; that they often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them; that they are more vulnerable or susceptible to . . . outside pressures than adults; and so on." *J. D. B. v. North Carolina*, 564 U.S. 261, 272 (2011) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115-16 (1982); *Bellotti v. Baird*, 443 U.S. 622, 635 (1979) (plurality opinion); *Roper*, 543 U.S., at 569) (internal quotation marks omitted).

113.    As the Court has explained, a child's susceptibility to immature and irresponsible behavior means that a child's "irresponsible conduct is not as morally reprehensible as that of an adult." *Roper*, 543 U.S. at 561. A child's vulnerability and comparative lack of control over his or her immediate surroundings means that children have a greater claim than adults to be forgiven for failing to escape negative influences in their environment. *Id.* at 570. "The reality that juveniles still struggle to define their identity means that it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Id.* In addition, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Id.* at 571.

114.    As the Supreme Court stated in *Miller*, "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds," specifically involving "behavior control." 567 U.S. at 471-2 (quoting *Graham*, 560 U.S. at 68) (internal quotations omitted). Further, a child's "transient rashness, proclivity for risk, and inability to assess consequences—both lessen[] a child's moral culpability and enhance[] the prospect that, as the years go by and neurological development occurs, [their] deficiencies will be reformed." *Id.*

115.    The Supreme Court's conclusions demand that children be afforded the opportunity to develop into mature adults before being judged incorrigible or irredeemable, and Louisiana's juvenile sex offender registration scheme is lagging far behind this jurisprudence. The fact that children are categorically less culpable than adults and less deserving of the harshest punishments our criminal justice system imposes, *see Graham*, 560 U.S. at 68; *Roper*, 543 U.S. at 570, highlights the unfairness of automatic, public, lifetime registration and underscores the devastating cost of that requirement when the law is used to impose adult consequences onto a child.

116.    Imposing lifelong stigmatizing punishment is egregiously disproportionate when based upon the conduct of a child, committed at a time when he or she lacks the developmental maturity necessary for sound decision-making. "From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Roper*, 543 U.S. at 570.

117.    Notably, these Supreme Court cases involved youths who were transferred to adult court—even for these youth who were otherwise treated as adults, the Court recognized the relevance of age and the importance of calibrating constitutional protections to account for age. Plaintiffs A.N., P.B., R.R., B.S., S.M., J.C., and H.C. had their cases adjudicated in juvenile court, not adult court. The Supreme Court's recognition that youth are less culpable, more impulsive, and more

susceptible to change than adults is even more salient in cases like Plaintiffs', which are not even transferred to adult court.

## III.    SORNA Undermines the Sole Purpose of the Juvenile Justice System

118.    Imposing SORNA requirements on people who committed sex offenses as children directly undercuts the stated rehabilitative, non-criminal purpose of Louisiana's juvenile justice system.

### A.    Louisiana's Juvenile System Is Meant to Be Rehabilitative, Not Punitive

119.    Pursuant to Louisiana Constitution Article V, § 19, the nature of the juvenile justice system is a non-criminal "focus on rehabilitation and individual treatment rather than retribution, and the state's role as *parens patriae* in managing the welfare of the juvenile in state custody." *In re C.B.*, 708 So. 2d 391, 397 (La. 1998) (citing *McKeiver v. Pennsylvania*, 403 U.S. 528 (1970); *Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Winship*, 397 U.S. 358 (1970)).

120.    Children in Louisiana who are not transferred to adult court have their cases adjudicated before juvenile courts, pursuant to Louisiana's Children's Code. Children are not "found guilty" of crimes and sentenced to prison time in the traditional sense. Rather, children are "adjudicated delinquent" at a "delinquency hearing" in a setting that is closed to the public and media. La. Chil. Code Art. 884(A).

121.    These adjudicatory hearings are informal and do not provide the procedural protections that adults receive in criminal court. For example, by law, adjudication hearings are held without juries and are closed to the public. La. Chil. Code Art. 882. Juvenile courts can only sentence children to confinement until they reach the age of 21. La. Chil. Code Art. 897.1. Nevertheless, juvenile court adjudications subject children to SORNA's lifetime registration requirements. La. R.S. 15:542. Children are therefore subjected to the lifetime punishment of registration without any assessment of a child's future risk or dangerousness.

31

**B.    Subjecting Children to SORNA Requirements Is Punitive, Not Rehabilitative**

122.    As discussed above, SORNA's requirements and restrictions have lifelong detrimental effects on the lives of people who committed sex offenses as children. These harsh restrictions are ostensibly meant to promote public safety, but sex offender registration schemes do not reduce recidivism or increase public safety, particularly in the case of people required to register for crimes they committed as children.

123.    The extreme nature of Louisiana's registration requirements for children adjudicated delinquent of sex offenses is motivated by fear-based, conclusory legislative findings, particularly regarding the risk of reoffending, that directly conflict with data-driven research and studies.[11] Even for adults convicted of sex offenses, academic studies cast serious doubt on the legislature's findings, and in the case of people who commit sex offenses as children, studies outright reject the legislature's findings; in reality, juvenile sex offenders have an extremely low recidivism rate generally and even lower sexual re-offense rates.[12]

124.    In recent years, there has been a plethora of studies on the recidivism rates of children who commit sex offenses that show that they have close to the lowest rates of recidivism among all people for all crimes. A recent meta-analysis of numerous studies found that 97% of all people with sex offenses committed as children never commit another sexual offense, regardless of the severity of their original offense.[13] Additionally, a research brief from the U.S. Department of Justice's Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking tells policy makers that "juveniles who commit sexual offenses are not the same as adult sexual

---

[11] The Louisiana legislature has found that "sex offenders, sexually violent predators, and child predators often pose a high risk of engaging in sex offenses, and crimes against victims who are minors even after being released from incarceration or commitment." La. R.S. § 15:540(A).

[12] Amy E. Halbrook, *Juvenile Pariahs*, 65 Hastings L.J. 1, 13.

[13] Sharon E. Denniston & Michael F. Caldwell, *Answering the Call to Study the Effects of Juvenile SORN: Lessons from Two Studies*, Paper Presented at the ATSA 34th Annual Research and Treatment Conference (Oct. 15, 2015).

offenders, and that *all juveniles who commit a sexual offense do not go on to sexually offend later in life*" and goes on to say that "juveniles who commit sexual offenses should not be labeled as sexual offenders for life, and sex offender management policies commonly used with adult sex offenders should not automatically be used with juveniles who commit sexual offenses."[14]

125.    Moreover, a growing body of research shows that registration has no impact on recidivism or deterrence.[15] People with sex offense convictions are already among the least likely to reoffend,[16] and type of offense is not a useful predictor of sexual recidivism.[17] "If a history of child sexual offending is used to predict a person's likelihood of future sex offending, that prediction would be wrong more than nine times out of ten."[18] The sexual recidivism rate for people required to register is not significantly different from sex crime rates of the general public.[19] Children who commit sex offenses are unlikely to reoffend as adults, especially when they receive appropriate treatment (which does not include registration).[20]

---

[14] Christopher Lobanov-Rostovsky, *Recidivism of Juveniles Who Commit Sexual Offenses*, Sex Offender Management Assessment and Planning Initiative (SOMAPI) Research brief, 5 (July 2015), https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/juvenilerecidivism.pdf.

[15] *See* Michael Caldwell, *Study Characteristics and Recidivism Base Rates in Juvenile Sex Offender Recidivism*, 54 Int'l J. Offender Therapy & Comp. Criminology 197, 201-2 (2010).

[16] Bureau of Justice Statistics, "Recidivism of Prisoners Released in 1994," Table 10: Rearrest Rates of State Prisoners Released in 1994, by most serious offense for which released and charge at rearrest, http://bjs.gov/content/pub/pdf/rpr94.pdf (accessed April 22, 2013) (giving the following percentages of prisoners rearrested within three years of release for the same type of offense: 1.2 percent for homicide, 2.5 percent for rape, 13.4 percent for robbery, 22 percent for non-sexual assault, 23.4 for burglary, 33.9 percent for larceny/theft, 11.5 percent for motor vehicle theft, 19 percent for fraud, 41.2 percent for drug offenses, and 31.2 percent for public order offenses).

[17] Ashley Batastini, et al. *Federal Standards for Community Registration of Juvenile Sex Offenders: An Evaluation of Risk Prediction & Future Implications*, 17 J. Psychol. Pub. Pol'y & Law 451, 457-58 (2011)

[18] *Raised on the Registry* at 28 (citing Franklin E. Zimring, An American travesty: Legal responses to adolescent sexual offending (citing M.F. Caldwell, 2002);"What we do not know about juvenile sexual reoffense risk," Child Maltreatment, vol. 7, pp. 291-203 (concluding, based on criminal justice cohorts analyzed by Franklin E. Zimring, that "more than nine out of ten times the arrest of a juvenile sex offender is a one-time event, even if the same offender may be apprehended in the future for the same mix of non-sexual offenses that is typical of other juvenile delinquents.").

[19] *Raised on the Registry* at 4.

[20] *See* Terance D. Meithe et al., Specialization and Persistence in the Arrest Histories of Sex Offenders: A Comparative Analysis of Alternative Measures and Offense Types, 43 J. Res. Crime &

126.    Registration has no ameliorative impact on recidivism or deterrence; instead, it may actually endanger the public by excluding registrants from legal and beneficial social and professional opportunities.[21] The Pennsylvania Supreme Court found that the registration requirements negatively affect people's "ability to obtain housing, schooling, and employment, which in turn hinders their ability to rehabilitate." *In re J.B.*, 107 A.3d 1, 16 (Pa. 2014). Thus, these exclusions, which are meant to deter crime and promote public safety, instead encourage registrants to participate in illegal activity because they cannot meet their basic needs through legal means.

127.    There are more than thirty published studies evaluating the recidivism rates of children who have sexually offended. The findings are remarkably consistent across studies, across time, and across population: sexual recidivism rates are low.[22] In a recent study in South Carolina, the recidivism rate for registered and nonregistered offenders was only 1%, and there was no difference between reconviction rates for registered and nonregistered offenders.[23]

128.    The recidivism rate is lower for children than for adults. Multiple studies confirm that children sexually offend for different reasons than adults. It is rare for juvenile sexual offenders' motivations to be sexual or predatory in nature; instead, children tend to offend based on

---

Delinq. 204, 222 (2006); Michelle L. Meloy, The Sex Offender Next Door: An Analysis of Recidivism, Risk Factors, and Deterrence of Sex Offenders on Probation, 16 Crim. Just. Pol'y Rev. 211, 225-26 (2005); Donna M. Vandiver, A Prospective Analysis of Juvenile Male Sex Offenders: Characteristics and Recidivism Rates as Adults, 21 J. Interpersonal Violence 673, 685 (2006); Dennis Waite et al., Juvenile Sex Offender Re-arrest Rates for Sexual, Violent Nonsexual and Property Crimes: A Ten-Year Follow Up, 17 Sexual Abuse: J. Res. & Treatment 313, 313 (2005); Franklin E. Zimring et al., Sexual Delinquency in Racine: Does Early Sex Offending Predict Later Sex Offending in Youth and Young Adulthood?, 6 Criminology & Pub. Pol'y 507, 529 (2007).

[21] Elizabeth Letourneau & Kevin Armstrong, *Recidivism Rates for Registered and Nonregistered Juvenile Sexual Offenders*, 20 Sexual Abuse: J. of Res. & Treatment 393 (2008); Sarah Tofte, Human Rights Watch, No Easy Answers 80-97 (2007), *available at* http://www.hrw.org/reports/2007/us0907/us0907web.pdf.

[22] Michael Caldwell, et al., *Study Characteristics & Recidivism Base Rates in Juvenile Sex Offender Recidivism*, 54 Int'l J. Offender Therapy & Comp. Criminology 197, 198 (2010) (citing to recidivism studies dating back to 1994).

[23] Letourneau and Armstrong, *supra* note 21.

34

impulsivity, sexual curiosity, or a history of being abused, among other reasons.[24] This is because children are fundamentally different from adults. As children mature developmentally, their understanding of their sexuality improves, and their impulsivity decreases—thus, most sexually inappropriate behaviors stop, and only a small fraction of juvenile offenders maintain sexually deviant behavior in adulthood.[25]

129.    Similarly, the existence of registration does not deter first-time juvenile sex crimes.[26]

130.    Labeling youth as deviants can alter their self-image as well as societal views of their personal traits.[27] The label itself can therefore create a self-fulfilling prophecy. Long-term sex offender labeling is likely to interrupt the natural process of developing a positive, healthy self-identity and undermine the goals of rehabilitation.[28]

131.    A 2017 study revealed that registered children "were nearly twice as likely to report having been sexually assaulted in the past year," when compared to nonregistered children who have also engaged in harmful or illegal sexual behavior.[29]

132.    Children on sex offender registries are four times more likely to report a recent suicide attempt than nonregistered children who have engaged in illegal sexual behavior.[30]

---

[24] *See* Michael F. Caldwell, *What We do not Know about Juvenile Sexual Re-offense Risk*, 7 Child Maltreatment 291 (2002); Judith Becker & Scotia Hicks, *Juvenile Sexual Offenders: Characteristics, Interventions, & Policy Issues*, 989 Ann. NY Acad. Sci. 397, 399-400, 406 (2003); Caldwell, *supra* note 22, at 197-98.

[25] Caldwell, *supra* note 22, at 205.

[26] Elizabeth J. Letourneau et al., *Effects of Sex Offender Registration Policies on Juvenile Justice Decision-making*, 21 Sexual Abuse: J. Res. & Treatment 149 (2009).

[27] Elizabeth J. Letourneau & Michael Miner, *Juvenile Sex Offenders: A Case Against the Legal and Clinical Status Quo*, 17 Sexual Abuse: J. Res. & Treatment 293, 313-31 (2005).

[28] *Id.* at 307; Maggie Jones, *How Can You Distinguish a* Budding *Pedophile From a Kid with Real Boundary Problems?*, N.Y. Times Mag., July 22, 2007, *available at* https://www.nytimes.com/2007/07/22/magazine/22juvenile-t.html.

[29] Elizabeth J. Letourneau et al., *Effects of Juvenile Sex Offender Registration on Adolescent Well-Being: An Empirical Examination*, 24 Psychol. Pub. Pol'y & L. 105, 114 (2018).

[30] *Id.* at 112.

133.    People who are registered as sex offenders also face the danger of vigilante justice: more than fifty percent of registered youth report experiencing violence or threats of violence against themselves or their family members that they directly attribute to their registration.[31]

134.    A Louisiana court of appeal recently noted that lifetime sex offender registration as applied to juveniles "ostensibly runs afoul of the entire premise for the juvenile justice system" and "may very well expose [individuals] to potential life-long direct stigmatization, social exclusion and ostracism, marginalization, harassment, residential restrictions, employment restrictions, alternative school arrangements, scrutiny and condemnation, which are theoretically expected as it pertains to an adult offender." *State ex rel. A.N.*, 2018-01571 (La. 10/22/19) n.7, 286 So. 3d 969, 972 (citing *State in Interest of A.N.*, 18-0219 (La. App. 4 Cir. 8/23/18) (unpub'd)). "By imposing such an onerous burden . . . the state 'has abandoned its role as *parens patriae* and has imposed draconian punishment instead of focusing on rehabilitation.' The court of appeal thus concluded that the requirements were punitive as applied to a juvenile, counterproductive to the goals of rehabilitation, and contrary to the long-held policy of the state to maintain confidentiality of juvenile records." *Id.*

## CLAIMS FOR RELIEF

### COUNT I:
### Cruel and Unusual Punishment
### Eighth Amendment to the United States Constitution

135.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

136.    Lifetime registration is punitive when imposed for childhood conduct and violates the Eighth Amendment ban on cruel and unusual punishment. Although the stated goal of SORNA

---

[31] Human Rights Watch, *Raised on the Registry: The Irreparable Harm of Placing Children on Sex Offender Registries in the US* 56-58 (May 1, 2013), https://www.hrw.org/sites/default/files/reports/us0513_ForUpload_1.pdf.

is to protect the community against recidivism, it primarily serves retributive purposes and is thus punitive for Eighth Amendment purposes.

137.    Lifetime registration is similar to traditional forms of punishment. Its imposition assumes that individuals require supervision, attaches at sentencing, carries the threat of incarceration for noncompliance, and requires conviction of a criminal offense. It further carries collateral consequences, including barriers to employment, schooling, and housing, as outlined herein.

138.    As applied to children, SORNA is also punitive because it is not rationally related to its stated non-punitive purpose. Individuals who commit sexual offenses as children are not likely to reoffend. Subjecting them to lifetime registration thus does not protect the public.

139.    Punishment is excessive if it is disproportionate to the offense. Proportionality review must take into account that children are constitutionally different from adults for purposes of sentencing. Children are different in that they generally are inherently less culpable than adults and differ from adults with sex offense convictions with regard to the risk of reoffending.

140.    At all times relevant herein, Defendants have acted under color of state law.

141.    Plaintiffs have suffered harm and will continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate cause of Defendants' violation of their rights under the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983. These harms will continue unless enjoined by this Court.

**COUNT II:**
**Ex Post Facto Laws**
**Article I, Section 10 of the United States Constitution**

142.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

143.    Plaintiffs S.M. and J.C. were adjudicated delinquent on their sex offenses prior to the enactment of Louisiana's SORNA, which became effective on January 1, 2008. Plaintiff P.B. was adjudicated delinquent on his sex offenses after the enactment of SORNA, but prior to the amendment that required juveniles to register for life (which became effective on August 15, 2008).

144.    The Ex Post Facto Clause of Article I, Section 10 of the U.S. Constitution forbids states from enacting any law that imposes a punishment for an act that was not punishable at the time it was committed or imposes additional punishment to that then prescribed.

145.    Accordingly, the automatic imposition of all obligations of SORNA to Plaintiffs S.M. and J.C. violates the Ex Post Facto Clause of the U.S. Constitution. The automatic imposition of the lifetime registration requirement of SORNA to Plaintiff P.B. violates the Ex Post Facto Clause of the U.S. Constitution.

146.    At all times relevant herein, Defendants have acted under color of state law.

147.    Plaintiffs S.M., J.C., and P.B. have suffered harm and will continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate cause of Defendants' violation of their rights under the Ex Post Facto Clause and 42 U.S.C. § 1983. These harms will continue unless enjoined by this Court.

### COUNT III:
### Due Process—Irrebuttable Presumption
### Fourteenth Amendment to the United States Constitution

148.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

149.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." The Supreme Court has recognized that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333

(1976). A court must consider three distinct factors to determine "the specific dictates of due process": (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the government's interest. *Id.* at 334-35.

150.    Registration as "sex offenders" deprives people of their rights to establish a home, to raise children, and to obtain and maintain employment. *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

151.    "The applicable due process standard in juvenile proceedings . . . is fundamental fairness." *McKeiver v. Pennsylvania*, 403 U.S. 528, 543 (1971). "The disposition of a child is so different from the sentencing of an adult that fundamental fairness to the child demands the unique expertise of a juvenile judge." *In re C.P.*, 967 N.E.2d 729, 748 (Ohio 2012). The importance of judicial discretion is cited as the justification for the absence of a jury in juvenile proceedings, but Louisiana law prohibits trial judges from waiving mandatory sex offender registration requirements. *State v. Quinones*, La. App. 03-907, 864 So. 2d 824, 2003 La. App. LEXIS 3692 (La.App. 5 Cir. 2003) (Defendant was not entitled to benefit from an unlawfully lenient sentence when the trial judge agreed to waive the sex offender registration requirement, as such a requirement was mandatory.).

152.    The presumption made by SORNA is that sex offenders who were children at the time of their offense will re-offend. Research demonstrates this to be false. Automatically subjecting people to mandatory registration under SORNA because of offenses that they committed when they were children presumes that these individuals are dangerous without providing a meaningful opportunity to challenge this presumption.

153.    This irrebuttable presumption of dangerousness violates due process because the presumption is not necessarily or universally true, and Plaintiffs are entitled to some adequate process to make the determination of dangerousness. *See Vlandis v. Kline*, 412 U.S. 441, 452 (1973).

154.    SORNA's registration requirements are unreasonable and overbroad in light of this irrebuttable presumption, and therefore violate due process.

155.    It is fundamentally unfair to impose the irrebuttable presumption of dangerousness on Plaintiffs and other individuals who are subject to lifelong SORNA requirements as a result of offenses they committed as children.

156.    At all times relevant herein, Defendants have acted under color of state law.

157.    Plaintiffs have suffered harm and will continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate cause of Defendants' violation of their due process rights under the Fourteenth Amendment. These harms will continue unless enjoined by this Court.

**COUNT IV:**
**Due Process—Right to Reputation**
**Fourteenth Amendment to the United States Constitution**

158.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

159.    Registration as "sex offenders" deprives people of liberty interests in their reputation, as protected by Article I, Section 22 of the Louisiana Constitution.

160.    Article I, Section 22 of the Louisiana Constitution establishes that "every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his . . . reputation." Children have a heightened right to reputation because a child's character is not yet fully formed.

161.    The sex offender label is defamatory as applied to Plaintiffs. Requiring lifetime registration for people who committed sex offenses as children brands those individuals as "sex offenders" throughout their lives. They carry the label of "sex offender" with the implication of likelihood to reoffend throughout their formative years and continuing through adulthood. That

40

label is published on the sex offender registry. These individuals then suffer a deprivation of rights—including the right to privacy, right to establish a home, right to raise children, and the right to obtain and maintain employment—through adulthood.

162.    Louisiana defamation caselaw recognizes liability for "probably false factual connotations." *Romero v. Thomson Newspapers (Wis.)*, 94-1105 (La. 01/17/95), 648 So. 2d 866, 870 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 at 20, 110 S. Ct. 2695 at 2706, 111 L. Ed. 2d 1 at 18 (1990)). The presumption of dangerousness in the label of "sex offender" conveys probably false factual connotations of future dangerousness which are factually disproven by the research on people who commit sex offenses as children.

163.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Louisiana may not deprive Plaintiffs of their right to reputation without an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333.

164.    The private interest at stake is substantial, since the defamatory label of sex offender costs Plaintiffs jobs, housing options, and social and familial connections. The risk of erroneous deprivation is high since the imposition of SORNA's requirements is automatic, and that risk could be greatly mitigated through a hearing to determine future dangerousness. The government's interest in defaming individuals who have not been determined to be dangerous is low or non-existent.

165.    At all times relevant herein, Defendants have acted under color of state law.

166.    Plaintiffs have suffered harm and will continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate cause of Defendants' violation of their due process rights under the Fourteenth Amendment. These harms will continue unless enjoined by this Court.

41

**COUNT V:**
**Right to Trial by Jury**
**Sixth and Fourteenth Amendments to the United States Constitution**

167.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

168.    Both Louisiana and federal caselaw make it clear that the purpose of the juvenile justice system is rehabilitation, not punishment. *See In re C.B.*, 708 So. 2d 391, 397 (La. 1998) (citing *McKeiver v. Pennsylvania*, 403 U.S. 528 (1970); *see also Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Winship*, 397 U.S. 358 (1970)). It is also well-established that no one can be sentenced to any type of punishment without first receiving a trial by jury. *See U.S. v. Haymond*, 588 U.S. __ (2019). However, juvenile court adjudications do not involve a jury, because they are not designed to impose punishments such as SORNA.

169.    Applying the punishment of SORNA to juveniles violates the principles of the juvenile court system by imposing immediately upon adjudication "a lifetime penalty that extends well beyond the age at which the juvenile court loses jurisdiction. It is a consequence that attaches immediately and leaves a juvenile with no means of avoiding the penalty by demonstrating that he will benefit from rehabilitative opportunities." *In re C.P.*, 967 N.E.2d 729, 737 (Ohio 2012).

170.    Ordinarily, "the discretionary role of the judge in the disposition of a juvenile case overrides the importance of the role of the jury. The disposition of a child is so different from the sentencing of an adult that fundamental fairness to the child demands the unique expertise of a juvenile judge." *Id.* at 748. But applying SORNA to juveniles "eliminates the discretion of the juvenile judge, this essential element of the juvenile process, at the most consequential part of the dispositional process" and "requires the automatic imposition of a lifetime punishment—with no chance of reconsideration for 25 years—without benefit of a juvenile judge weighing its

42

appropriateness. An automatic longterm punishment is contrary to the juvenile system's core emphasis on individual, corrective treatment and rehabilitation." *Id.*

171.    Therefore, it is unconstitutional for a child to be subject to the punishment of SORNA registration without the full due process accorded to adults, including trial by jury.

172.    At all times relevant herein, Defendants have acted under color of state law.

173.    Plaintiffs have suffered harm and will continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate cause of Defendants' violation of their Sixth and Fourteenth Amendment rights. These harms will continue unless enjoined by this Court.

**COUNT VI:**
**Compelling Speech**
**First Amendment to the United States Constitution**

174.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

175.    The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

176.    There is a four-step test to determine whether Louisiana SORNA's printing of "**SEX OFFENDER**" on driver's licenses and identification cards does, in fact, compel speech: There must be (1) speech; (2) to which Plaintiffs object; (3) that is compelled; and (4) that is readily associated with Plaintiffs. *Cressman v. Thompson*, 798 F.3d 938, 949-51 (10th Cir. 2015). All four elements are met here, as (1) "**SEX OFFENDER**" is speech, (2) Plaintiffs do not agree that the label "**SEX OFFENDER**" accurately describes them, (3) Plaintiffs are compelled to display the offensive message, and (4) the message on the branded IDs is "readily associated" with Plaintiffs. *See Doe v. Marshall*, 367 F. Supp. 3d 1310, 1324-26 (M.D. Ala. 2019).

177.    Because it compels speech, SORNA's branded-identification requirement "is a content-based regulation of speech." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361,

43

2371 (2018); *see also Riley v. National Federation of the Blind*, 487 U.S. 781, 795 (1988) ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech."). As a result, it must pass strict scrutiny. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). That means the State must have a compelling interest, and it must have adopted the least restrictive means of achieving that interest. *Id.* Even if Louisiana has a compelling interest in enabling law enforcement to identify a person as a sex offender, it has not adopted the least restrictive means of achieving that interest. "By using 'SEX OFFENDER' instead of a single letter, the State goes beyond what is necessary to achieve its asserted interest." *Doe v. Marshall*, 367 F. Supp. 3d 1310, 1326 (M.D. Ala. 2019).

178.    The Supreme Court of Louisiana recently held that requiring the "**SEX OFFENDER**" label on state-issued identification cards is unconstitutional. *State v. Hill*, 2020 La. LEXIS 2512 (La. Oct. 20, 2020).

179.    In light of this ruling, Plaintiff A.N. has attempted to obtain a new license and identification card without the "**SEX OFFENDER**" labels by inquiring with the OMV. Plaintiff H.C. also attempted to obtain a new license and identification card without the **SEX OFFENDER**" labels by inquiring with the state registry officials. Plaintiff R.R. also attempted to obtain a new license and identification card without the labels by inquiring with the office where he goes for his regular check-ins. Despite these efforts, Plaintiffs A.N., H.C., and R.R. have not been granted new licenses or identification cards. These denials are in direct violation of Plaintiffs' First Amendment rights as recognized by the Louisiana Supreme Court.

180.    At all times relevant herein, Defendants have acted under color of state law.

181.    Plaintiffs have suffered harm and will continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate cause of Defendants' violation of their First Amendment rights. These harms will continue unless enjoined by this Court.

## COUNT VII:
## Chilling Free Speech
## First Amendment to the United States Constitution

182.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

183.    Louisiana SORNA's social media restrictions burden Plaintiffs' "ability and willingness to speak on the Internet," *Doe v. Marshall*, 367 F. Supp. 3d 1310, 1327 (M.D. Ala. 2019), even though none of Plaintiffs' adjudications related to any online activity. Strict scrutiny applies because the law is not content neutral, but "because [SORNA] burdens substantially more speech than necessary, it fails even intermediate scrutiny." *Id.* at 1328-29.

184.    At all times relevant herein, Defendants have acted under color of state law.

185.    Plaintiffs have suffered harm and will continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate cause of Defendants' violation of their First Amendment rights. These harms will continue unless enjoined by this Court.

## COUNT VIII:
## Right to Intimate Association
## First and Fourteenth Amendments to the United States Constitution

186.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

187.    The First and Fourteenth Amendments guarantee the right to intimate association,[32] which protects against "unjustified government interference" in one's intimate relationships. *Board of Dir's. of Rotary Int'l. v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987) (citations and quotations omitted); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 618-20 (1984). Strict scrutiny applies because the

---

[32] This claim is substantially similar under either the First or Fourteenth Amendment, but "there is disagreement amongst some courts regarding which amendment such claims are properly considered under." *In the Interest of N.L.P.*, U.S. Dist. LEXIS 93766 *10 n.4 (E.D. Tex. May 3, 2018). Thus, Plaintiff brings this claim under both.

right to intimate association is a "fundamental right." *Louisiana Debating & Literary Ass'n. v. City of New Orleans*, 42 F.3d 1483, 1498 (5th Cir. 1995).

188.    Louisiana's SORNA restrictions prevent Plaintiffs from being able to effectively parent their children, cause undue stress on Plaintiffs' marriages and other close relationships, and keep Plaintiffs from being able to reside with family members when any minors are present.

189.    Plaintiffs have suffered harm and will continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate cause of Defendants' violation of their First and Fourteenth Amendment rights. These harms will continue unless enjoined by this Court.

## PRAYER FOR RELIEF

Plaintiffs have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, policies, and practices of Defendants, as alleged herein, unless Plaintiffs are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the United States Constitution.

WHEREFORE, Plaintiffs respectfully request that this Court award the following relief:

(a) An order and judgment declaring that the application of SORNA to Plaintiffs, who committed their offenses as children, violates Plaintiffs' rights under the United States Constitution, as described in this Complaint;

(b) An order and judgment enjoining Defendants from continued enforcement of SORNA as it applies to Plaintiffs, who committed their offenses as children;

(c) An order and judgment that Defendants must return to Plaintiffs any funds expended in order to stay in compliance with SORNA throughout their registration period;

(d) An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(e) Any other relief this Court deems proper.

Respectfully submitted this 27th day of January, 2021.

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287
Nishi Kumar, La. Bar No. 37415
Rebecca Ramaswamy, La. Bar No. 39524
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Email: mmontagnes@defendla.org

John Adcock, La. Bar No. 30372
Adcock Law LLC
3110 Canal Street
New Orleans, LA 70119
Telephone: (504) 233-3125
Email: jnadcock@gmail.com

*Attorneys for Plaintiffs*

47